TRIGO HNOS., INC., and Casera Foods, Inc., Plaintiffs,

v.

PREMIUM WHOLESALE GROCERIES, INC., et al., Defendants.

No. 76 Civ. 2544-CSH.

United States District Court, S. D. New York.

Oct. 14, 1976.

Tufo, Johnston & Allegaert, New York City, for plaintiffs.

Lopez & Koppell, New York City, for defendants.

## MEMORANDUM AND ORDER

HAIGHT, District Judge:

Under date of July 16, 1976, this Court issued a Memorandum and Order vacating the *ex parte* writ of attachment which had been obtained by the plaintiffs against the defendants. Familiarity with that memorandum is assumed for the sake of the following opinion.

There are now pending before the Court three motions, as follows:

(1) Plaintiffs move for summary judgment on the first and second causes of action alleged in the complaint.

(2) Plaintiffs move for reargument of the defendants' motion to vacate the order of attachment, and for reinstatement of that order.

(3) Defendants move for damages, including attorneys' fees, arising out of the original *ex parte* attachment, which this Court vacated.

These motions will be disposed of in the order stated above.

*Plaintiffs' Motion for Summary Judgment*

Plaintiffs move, pursuant to Rule 56(a), F.R.C.P., for summary judgment on the first and second causes of action alleged in the complaint.

The first cause of action alleges that the plaintiffs sold and shipped merchandise to defendant Premium and that there are presently outstanding unpaid invoices for such merchandise in a total amount of $149,690.14.

The second cause of action, on behalf of plaintiff Casera, against the individual defendants Baez and Romanach, alleges that the individual defendants executed personal guarantees of the credit extended by Casera to the corporate defendant, Premium; that Premium presently owes Casera $134,-211.06 (an amount which is included in the $149,690.14 alleged in the first cause of action); and that the individual defendants are liable on their guarantees.

The basic premise underlying both causes of action is the plaintiffs' characterization of the relationship between the plaintiffs and the defendant Premium. Plaintiffs view that relationship as the relatively simple, uncomplicated one between seller and purchaser; between a supplier and a merchant. Thus, in their brief in support of summary judgment, plaintiffs cite a number of cases granting summary judgment "on a claim for goods sold and delivered" (brief, p. 12).

The cases cited do indeed grant summary judgment on the facts presented; but in each of them, the defendant either asserted no defense at all to the claim established by commercial documents, or attempted to interpret those commercial documents in a manner which was contrary to law, and whose legal fallibility could be perceived by the court from the face of the documents themselves. Thus, in *Omark Industries, Inc. v. Lubanko Tool Co., Inc.*, 266 F.2d 540, 541 (2d. Cir. 1959), the Second Circuit held that granting of summary judgment was proper where "plaintiff relies on the purchase orders and invoices to establish its claim, and defendant does not plead any affirmative defense based on those documents." In *Metro Corrugated Containers v. Owens-Illinois Glass Co.*, 185 F.Supp. 359, 361 (E.D.N.Y.1960), the court observed that "there is no denial of the receipt of the goods *and the obligation to pay*" (emphasis added). In *Petroleo Brasilero S.A. v. Ameropan Oil Corp.*, 372 F.Supp. 503 (E.D.N.Y. 1974), plaintiff recovered on a C.I.F. contract of sale for fuel oil. Defendant, seeking to resist summary judgment, argued that a variation in the contract as to the date of payment for the goods deprived it of its essential characteristics as a C.I.F. contract. The court, directing summary judgment, held that the variation in question was of no legal significance:

"Since the term is so well understood, any commercially reasonable variation should not be allowed to destroy that meaning." 372 F.Supp. at p. 506.

In the case at bar, the defendants place an entirely different characterization upon the relationship between the plaintiffs, its principal officer Trigo and the corporate and individual defendants. The defendants contend, in essence, that Premium paid its invoices promptly up to a certain point in time, when Trigo expressed an interest in purchasing a 50% interest in the corporate defendant Premium, so that Premium could become a vital arm of the plaintiffs' efforts to market their food products in the New York area. Against that background, the defendants contend, the subsequent shipments by plaintiffs to defendant Premium (which defendants say were substantially in excess of their own purchase orders) should be regarded as prompted by "the impending acquisition of Premium by Casera" (Romanach affidavit in opposition at para. 5, p. 3). The defendants' basic premise is set forth in the Romanach affidavit, at para. 13, pp. 5–6:

"On January 19, 1976, Mr. Dionisio Trigo advised Mr. Romanach that since in the near future Premium was going to be an arm of the Trigo organization in New York, he would give instructions to his organization to make such shipments as they thought would be appropriate and necessary to firmly establish the Casera brand within this area.

"We accepted this proposition because we honestly thought that this would be a very good method to enable the Premium company to grow substantially, and even though we were selling one half of the company to outsiders, we felt that in the long run it would be most beneficial to all involved. We were also enthused by the fact that we had already been promised in writing the exclusive distribution of

the Casera brand within the area, and we had no reason to believe that this transaction would be abrogated with the repercussions that it has had.

"14. We believe that the position of plaintiffs in demanding the value of whatever goods they may have shipped is not that of an account stated since said goods were not shipped in contemplation of payment."

 These assertions by defendants are sufficient to distinguish, on their facts, the cases granting summary judgment upon which plaintiffs rely. It does not follow, however, that merely because a party resisting summary judgment alleges the existence of a relationship inconsistent with his adversary's theory of recovery, summary judgment must automatically be denied. Summary judgment is appropriate where, on all the papers, it appears that "there is no genuine issue as to any material fact . . . ." Rule 56(c). The threshold question of whether a genuine issue of a material fact is presented is for the court, in response to the summary judgment motion. If such an issue appears, its resolution is for the triers of the facts, and the case must be tried.

Both plaintiffs and defendants have submitted lengthy affidavits, and voluminous documentary exhibits in support of their motions for and against summary judgment.

 While each case turns upon its own circumstances, well-recognized guidelines may be found in 6 *Moore's Federal Practice* (2d Ed. 1976), at paragraph 56.15[4], a discussion captioned "Existence of a Genuine Issue". Professor Moore begins his discussion as follows:

"The party moving for summary judgment has the burden of clearly establishing the nonexistence of any genuine issue of fact that is material to a judgment in his favor. In discharging this burden he must show that taking his moving papers as true they establish the lack of such a triable issue of fact; and that they are true. In reference to both of these matters, and particularly the latter dealing with credibility, the opposing party's general right of cross-examination is often important." p. 56–511.

Moore also observes:

"On the whole, affidavits are the least satisfactory form of evidentiary materials upon which to base a summary judgment." p. 56–514.

The basic reason for this is that, where credibility issues are raised by the papers, disposition of the case on affidavits does away with the right of cross-examination and the ability of the triers of the fact to observe and evaluate the witnesses. In respect of genuine issues of credibility requiring trial, Moore states generally:

"When at the hearing on a motion for summary judgment there is contradictory evidence, or the movant's evidence is impeached, an issue of credibility is present, *provided the contradicting or impeaching evidence is not too incredible to be believed by reasonable minds.*" (emphasis added). pp. 56–523–4.

This last quoted phrase aptly summarizes the court's function in its threshold determination of the existence or nonexistence of a genuine issue of material fact. The plaintiffs argue that defendants' characterization of the underlying relationship between the parties, with its consequent effect upon post-January 19, 1976 shipments of merchandise, is not and cannot be true, and must be disregarded as a sham and frivolous. Affidavits and exhibits are submitted in support of that contention. The defendants submit affidavits and exhibits which they contend support the relationship which has been summarized above. The Court's function on this summary judgment motion is to consider whether the defendants' evidence is "too incredible to be believed by reasonable minds."

 In *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317 (2d Cir. 1975), the Second Circuit in an opinion by Chief Judge Kaufman recognized that the Circuit had departed, in more recent years, from its initial view that summary judgment would be approved only in "the most

extraordinary circumstances", 524 F.2d at p. 1319. But *Heyman* serves to remind us of the continuing validity of the propositions stated by *Moore, supra* :

"But, the 'fundamental maxim' remains that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried. *American Manuf. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir. 1967); *Cali v. Eastern Airlines, Inc.,* 442 F.2d 65, 71 (2d Cir. 1971). Moreover, when the court considers a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute, *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). This rule is clearly appropriate, given the nature of summary judgment. This procedural weapon is a drastic device since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury. *Donnelly v. Guion,* 467 F.2d 290, 291 (2d Cir. 1972)." 524 F.2d at pp. 1319–1320.

■ Turning to the case at bar, I conclude that defendants' evidence, when viewed in the light of all the circumstances of the case, and the foregoing guidelines, may not be disregarded as incredible or a sham. I do not reach that conclusion on the basis of the averments in the opposing affidavits alone. The documentary exhibits contain indications that the defendants' basic premise may be true. Without expressing any opinion on the underlying merits, I hold that the defendants are entitled to attempt to persuade the triers of the fact that their basic premise is true.

Several illustrations will suffice.

The affidavit of Arnaldo L. Principe, controller of plaintiff Casera, submitted in support of the summary judgment motion, alleges in respect of a significant number of the shipments in suit:

"10. During the last week of January, 1976 defendant Baez spoke to me several times by telephone and placed orders for substantial quantities of Casera merchandise. These orders were confirmed by the Purchase Orders which are attached Exhibits B–1 through B–6. These Purchase Orders were mailed to me with a letter from defendant Baez dated February 3, 1976 which I received on February 10, 1976 (a copy of this letter is attached as Exhibit C). This merchandise was shipped pursuant to Casera Invoices Nos. 601122, 601128, 602010, 602030, 602031, 602055, 602152, 603019 and 603063 (attached as Exhibits B–7 through B–15). Some of the merchandise was shipped pursuant to oral instructions before I received the letter of February 3, 1976 (see Exhibits B–7 through B–11 and Exhibit C)."

When Premium's purchase orders, Exhibits B–1 through B–6, are compared with the Casera invoices, Exhibits B–7 through B–15, it is immediately apparent that the invoices reflect considerably greater quantities of merchandise than were contemplated by the purchase orders.[1] Defendants say that this discrepancy indicates that Premium was not dealing on a regular, purely commercial basis with Casera as a supplier; rather, it is said that such quantities shipped in excess of quantities ordered reflected "the impending acquisition of Premium by Casera".[2]

Plaintiffs contend, in response on this issue, that the apparent discrepancy may be

---

1. On the left-hand side of both purchase orders and invoices, the quantity of each item is stated. By the court's count, the quantity total on the purchase orders is less than 8400, and the quantity total on the invoices is in excess of 12,400.

2. Defendants contend, as part of their basic premise, that the value of merchandise shipped by plaintiffs to Premium and not paid for was to be taken into consideration at the closing of the merger, when Casera was to receive 50% of Premium's stock.

explained by verbal orders made by Premium, not reflected in written purchase orders. Other facts and circumstances are also put forward to explain the question. However, the defendants deny that any such verbal orders were made by them. They contend that all orders of Premium's were made by written purchase orders. The dispute is typical of the questions of fact which must be resolved by trial.

Secondly, defendants point out that one of the Casera invoices (Exhibit B–9) recites that the order in question was based upon a verbal order by one V. Vazquez. Defendants say that Mr. Vazquez was the sales manager of the plaintiff Trigo Corporation, and that he placed this order from Premium, to his own company, while in New York in February, 1976. Defendants say that this indicates that Premium "for all practical purposes had become the arm of Casera in the greater New York area", in a manner inconsistent with plaintiff's theory of the relationship.

Third, defendants contend that all promotional campaigns and advertising of the Trigo and Casera products had to be cleared with the Trigo organization in Puerto Rico, before they could begin. A letter dated March 29, 1976 from an advertising agency in New York said to represent the Trigo interests (Romanach affidavit, Exhibit 4) appears to be consistent with this contention. Defendants say that this factor is inconsistent with an uncomplicated relationship of supplier and wholesaler, and is more consistent with the concept of a joint venture.

This interpretation finds further possible support in a letter sent by plaintiffs' representative Bouza to defendant Romanach dated April 20, 1976 (Exhibit L–6 to Principe affidavit), in which Casera gives Premium pricing and display instructions in respect of the marketing by Premium of a Casera product, tomato sauce. That letter contains this paragraph:

"It is very important to get the display of the product at reduced prices because the ultimate goal of *our joint effort* is that the product is passed through to the consumer and to this end it is indispensable that the product is displayed at reduced prices and in that way, getting the best benefit from the advertising campaign that will commence at the end of this month." (emphasis added).

While the court recognizes that such language is subject to more than one interpretation, it is at least arguable that it supports the interpretation of the defendants in respect of the underlying relationship between the parties.

It is unnecessary further to prolong this discussion. Plaintiffs, in their motion papers, put forward allegations, arguments, and collect exhibits which would undoubtedly permit the triers of the fact to reject the defendants' factual contentions. However, I hold that plaintiffs have failed to sustain their burden of demonstrating that there is no genuine issue of a material fact, particularly in a case where issues of credibility are of central significance. The defendants' contentions find sufficient support in the moving papers to entitle them to their day in court. The motion for summary judgment is denied.

### Reargument of Motion to Vacate Attachment

Rule 9(m) of the General Rules of this court requires that a notice of motion for reargument be accompanied by a motion "setting forth concisely the matters of controlling decisions which counsel believes the court has overlooked."

The court's prior opinion held that a cause of action for fraud could not, in law, proceed from plaintiffs' alleged reliance upon the financial data they received from their Puerto Rico bank, the Banco Popular. The New York cases cited in the court's original opinion demonstrate that a defendant whose property has been attached on the basis of plaintiff's allegations of fraud may, by means of a motion to vacate the attachment, test the legal sufficiency of the allegation of fraud, and, as well, the evidence of fraud submitted to obtain the writ of attachment. While plaintiff need not demonstrate, on a motion to vacate, that he

will ultimately prevail, he must present more than "a scintilla of proof as to the requisite elements of the fraud cause of action alleged in the complaint." *MacMillan v. Hafner,* 42 A.D.2d 533, 344 N.Y.S.2d 729 (1st Dept., 1973). As the cited case holds, where such proof is insufficient the writ of attachment is dismissed. The trial court has undoubted discretion under CPLR § 6223 to vacate an attachment order, in response to a motion to vacate, "when evidence, though not lacking altogether, may seem too weak or uncertain to justify the remedy", *AMF Inc. v. Algo Distributors Co.,* 48 A.D.2d 352, 361, 369 N.Y.S.2d 460, 468 (2d Dept., 1975).

▆▆▆ The financial information obtained by plaintiffs through Banco Popular is legally insufficient to support a charge of fraud by plaintiffs against defendants because, in fraud cases, the plaintiff must show that the defendant "knowingly uttered a falsehood *intending to deprive the plaintiff* of a benefit and that the plaintiff was thereby deceived and damaged." *Channel Master Corp. v. Aluminum Ltd. Sales,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958). Information, even if false, must in order to support a claim of fraud be "employed with intent to defraud the plaintiff", *Howells v. Albert,* 37 Misc.2d 856, 236 N.Y.S.2d 654, 657 (S.Ct. Nassau, 1962). The headnote in *Dale System v. General Teleradio, Inc.,* 105 F.Supp. 745 (S.D.N.Y.1952) reads:

"Representation, knowingly false, does not authorize action of deceit unless made with intent to be communicated to persons acting upon it to their prejudice."

"Intent", in the context of fraud, "involves the purpose to use a *particular* means to effect a *definite* result." *Sutro Bros. v. Indemnity Insurance Co. of North America,* 264 F.Supp. 273, 288 (S.D.N.Y.1967) (construing New York cases; emphasis is the court's), *aff'd,* 386 F.2d 798 (2d Cir. 1967).

▆▆▆ In the case at bar, defendants, in response to plaintiffs' inquiry, did nothing further than to give the United Americas Bank as a credit reference for the corporate defendant, Premium. It is reasonable to assume that defendants neither anticipated nor intended any inquiry to the bank other than the usual questions in respect of size and longevity of the account, whether the account had been free from default, and the like. Instead, the plaintiffs, proceeding through their own banking contacts in Puerto Rico, obtained through the United Americas Bank financial statements and documents concerning prior and unrelated transactions. Defendants contend that such information was obtained by the plaintiffs in violation of pertinent law. I need not resolve that question. It is sufficient, on the writ of attachment question, to observe that, even assuming *arguendo* the falsity of certain of these statements, the requisite element of intent that plaintiffs obtain and rely upon this information is missing. I have also concluded, for the reasons expressed in my original opinion, that in these circumstances the defendants could not have reasonably foreseen that these particular documents would find their way into the plaintiffs' hands, and thereafter be relied upon by the plaintiffs. Accordingly, to the extent that the plaintiffs rely upon statements contained in the documents obtained through Banco Popular, an essential element of a cause of action for fraud is missing. That was the thrust of the original opinion, reiterated here. Plaintiffs, in this motion for reargument, have failed to sustain their burden under Rule 9(m) of directing the court's attention to controlling matters or decisions which were previously overlooked, and which require a different result.

▆▆▆ Plaintiffs' order of attachment was vulnerable to *vacatur* in its entirety because the papers submitted on the original application were entirely insufficient to demonstrate to what extent plaintiffs had relied upon the bank-obtained documents in shipping merchandise to Premium on credit. The burden was on plaintiffs to demonstrate, in aid of their order of attachment, a fact situation which, viewed in the light of pertinent law, made a *prima facie* showing of entitlement. The original order of attachment was vulnerable to defendants' at-

tack on the motion to vacate, because that showing had not been made.

The additional affidavits submitted in respect of the present motions, primarily the Principe affidavit, clarify some of these uncertainties. Plaintiffs contend that on February 23, 1976, during a meeting in New York, defendant Romanach made false representations directly to representatives of Trigo in respect of Premium's financial condition; and that plaintiffs relied upon those particular statements in continuing to make shipments to Premium. These alleged misrepresentations, of course, stand upon an entirely different footing. Plaintiffs' present papers allege that, as a result of these alleged misrepresentations by Romanach on February 23, and in reliance upon them, plaintiffs shipped to Premium merchandise having a total value of $74,978.06 (plaintiffs' memorandum on these motions, at pp. 8–9, para. 3 and 4).

The allegations of the complaint, as clarified by these additional motion papers, are sufficient to support an order of attachment in the amount just stated. It does not follow, however, that plaintiffs are entitled as of right to an order of attachment. On the contrary, no such right exists under New York law.

■ The New York attachment statute, CPLR § 6201, provides that where the requisite elements are shown, "an order of attachment *may* be granted in any action . . ." (emphasis added). It is well recognized that the court has discretion to deny an order of attachment, even where the plaintiff may have shown the statutory requirements for the provisional remedy. The general rule is stated in *Elliott v. Great Atlantic & Pacific Tea Company,* 11 Misc.2d 133, 171 N.Y.S.2d 217, *aff'd,* 11 Misc.2d 136, 179 N.Y.S.2d 127 (1957):

> "The granting of a warrant of attachment is discretionary and not a matter of right, and in its very nature is a provisional remedy. Even though a party may show the basic requirements of Secs. 902, 903, Civil Practice Act, relied upon by the plaintiff herein, the Court need not grant attachment. *Haebler v. Bernharth,* 115

N.Y. 459, 22 N.E. 167." 171 N.Y.S.2d at p. 219.

In *Waterman-Bic Pen Corp. v. L. E. Waterman Pen Co.,* 19 Misc.2d 421, 190 N.Y.S.2d 48 (Sup.Ct.N.Y.1959), reversed on other grounds, 8 A.D.2d 378, 187 N.Y.S.2d 872, the court, citing *Elliott,* stated:

> "Where the attachment is likely to be oppressive, as here, and may work irremediable hardship, discretion of the court is called in aid of the oppressed." 190 N.Y.S.2d at p. 51.

■ In the case at bar, I exercise my discretion and deny a writ of attachment, notwithstanding the additional documents submitted by plaintiffs on the present motions.

The evidence submitted by defendants in support of their motion for damages arising out of the initial attachment (discussed *infra*) makes it clear that attachment of the assets of the corporate defendant, Premium, resulted in substantial hardship to the company. Service of the original order of attachment resulted in about $7,000 being frozen in Premium's bank accounts. A number of outstanding checks were returned for insufficiency of funds, as a result of the attachment. This led in turn to a number of Premium's suppliers and creditors cancelling the original credit terms, and placing Premium upon a strict cash basis. The nature of Premium's operations, as revealed by the papers before me on these motions, indicates that the effect of the attachment was highly oppressive in respect of Premium's ability to conduct its business.

■ I further draw the inference, from the papers before me, that Premium is continuing in business, attempting to prosper in its affairs; and there is no evidence upon which I could base an inference that the corporate defendant, or the individual defendants, are dissipating, removing or concealing assets which might otherwise be available to plaintiffs in aid of judgment. These factors are pertinent to the exercise of the court's discretion. In *Elliott, supra,* the court stated:

"Attachment is an extraordinary remedy in that it permits the seizure of the defendant's property prior to the adjudication of the claim and the determination of liability. The right to make such seizure should be and is carefully circumscribed. It runs counter to the fundamental common-law concept that before depriving a defendant of his property, opportunity for proper adjudication should be afforded (Cf. *Rowles v. Hoare*, 61 Barb. 266, 270; *Reich v. Spiegel*, 208 Misc. 225, 230, 140 N.Y.S.2d 722, 726; Seventh Annual Report and Studies of the Judicial Council, 1941).

"Due to the harsh nature of this remedy, Secs. 902 and 903 of the Civil Practice Act should be construed in accordance with the general rule applicable to statutes in derogation of the common law, strictly in favor of those against whom it may be employed (*Penoyar v. Kelsey*, 150 N.Y. 77, 80, 44 N.E. 788, 789, 34 L.R.A. 248).

"The granting of a warrant of attachment must be carefully weighed because of the irreparable injury that may be done to the party against whom it is sought. Where, as here, the Court has already acquired jurisdiction of the person, there must be a showing that the objective (judgment) will not be realized, i. e., that the defendant will dissipate or remove and conceal its assets." 171 N.Y. S.2d at pp. 219–220.

Accordingly, partially as a matter of law and partially in the exercise of my discretion, I deny plaintiffs' motion for reargument, and for reinstatement of the order of attachment.

### Defendants' Motion for Damages

 Defendants have moved for an award of damages, in an unspecified amount, arising out of the prior attachment; and also for an award of attorneys' fees and expenses incurred in the motion to vacate the attachment and in opposition to plaintiffs' motion for reargument of the *vacatur*. Legal fees in the amount of $3,450.00 are claimed, and disbursements in an amount of $44.00, making a total claim in respect of legal costs of $3,494.00.

I deny the claim for damages at large, since the papers before me form the basis for nothing other than speculation, and that is legally insufficient to support an award. However, in view of the fact that the original *ex parte* order of attachment was obtained on papers which the court has now held to be legally insufficient, defendants are entitled to recover their legal costs, which I find on the basis of counsel's supporting affidavit to have been necessarily incurred and reasonable in amount.

Accordingly the Clerk of the Court is directed to enter a judgment in favor of defendant Premium Wholesale Groceries, Inc. and against plaintiffs Trigo Hnos. Inc. and Casera Foods, Inc., jointly and severally, in the amount of $3,494.00, with interest to run from the date of this order.[3]

### Conclusion

The dispositions of the motions may be summarized as follows:

1. Plaintiffs' motion for summary judgment is denied.

2. Plaintiffs' motion for reargument of the order vacating attachment, and for reinstatement of the order of attachment, is denied.

3. Defendants' motion for damages resulting from wrongful attachment is denied; but defendants' motion for legal costs in the amount of $3,494.00 is granted, and the Clerk is directed to enter judgment accordingly, and in accordance with the terms of this opinion.

It is So Ordered.

---

**3.** See, generally, *A. C. Israel Commodity Co. v. Banco do Brasil,* 50 Misc.2d 362, 270 N.Y.S.2d 283 (Sup.Ct.N.Y.1966).